HARMONY COMMUNITY SCHOOL

v.

OHIO DEPARTMENT OF EDUCATION.

Court of Claims of Ohio.

No. 2000–12726.

Decided Sept. 22, 2003.

Phyllis E. Brown, for plaintiff.

Jim Petro, Attorney General, and Peggy W. Corn, Assistant Attorney General, for defendant.

---

J. Warren Bettis, Judge.

{¶ 1} Plaintiff Harmony Community School brought this action against defendant Ohio Department of Education, alleging that defendant exceeded the scope of its statutory authority when it improperly withheld operating funds from plaintiff's fiscal year 2000 payment. The case proceeded to trial on the issues of liability and damages.[1]

{¶ 2} Plaintiff was one of the first community schools to operate in Ohio when it opened for the 1998–1999 school term in the Cincinnati City School District. Community schools are independently governed public schools that are funded from state revenues pursuant to R.C. Chapter 3314. Pursuant to R.C. 3314.02(C)(1)(d), each community school has a public sponsor; defendant was plaintiff's sponsor. R.C. 3314.03 requires that the community school's sponsor and governing authority enter into a contract that includes a comprehensive educational plan.

{¶ 3} Before the contract at issue was executed, defendant's Office of School Options ("OSO") was required to approve plaintiff's proposed educational plan. Defendant negotiated certain changes in the contract that did not affect the educational plan. On July 31, 1998, defendant and plaintiff's governing authority entered into a contract.

{¶ 4} R.C. Chapter 3314 sets forth the formula for calculating community school funding (R.C. 3314.08). Community schools cannot charge tuition, are not supported by bond issues or tax levies, and are almost entirely dependent on state funding (R.C. 3314.08[G].) Like traditional public schools, community schools receive funding based upon the number of students that are enrolled during the school term. Community school funding was administered through defendant's Office of School Finance ("OSF"), now known as the Center for Finance and School Accountability.

{¶ 5} When community schools first opened for the 1998–1999 academic year, they were initially funded for the first half of the school year based upon the school's pre-opening estimate of enrollment. Beginning in January 1999, commu-

---

1. This case was originally tried before Judge Russell Leach on April 29–May 1, 2002. In the intervening period between trial and the filing of a decision and judgment entry, Judge Leach died. This case was then assigned to Judge J. Warren Bettis and set for a new trial.

nity schools were funded for the second half of the year using a "snapshot" enrollment count that had been taken during the first week of October, when all public schools, including community schools, were required to report their enrollment. The October count, known as the Average Daily Membership ("ADM"), determines traditional public school funding for the entire school year (R.C. 3317.03). Plaintiff's estimate of enrollment for the first half of the 1998–1999 academic year was 200 students and during the second half of the school year, it was paid on an ADM enrollment of 201.

{¶ 6} Following the 1998–1999 school term, defendant notified plaintiff of its intent to conduct a "full-time equivalent" ("FTE") audit to reconcile any inaccuracy in the enrollment figures derived from the pre-opening estimate or the ADM count. During the fall of 1999, defendant first contacted plaintiff to schedule an FTE audit for the 1999 fiscal year. Plaintiff's president, David Nordyke, testified that he was reluctant to schedule an audit because he had concerns about the audit process. On April 19, 2000, Susan Tavakolian, OSF's Executive Director, sent Nordyke a letter informing him that defendant would suspend further payments to plaintiff if plaintiff did not arrange a time for the audit prior to May 1. The letter directed plaintiff to contact Fred Ross, defendant's area coordinator, to schedule the audit.

{¶ 7} On April 25, 2000, Ross sent Robert Witt, plaintiff's treasurer, an "FTE Resource Guide" that had been published in October 1999. The resource guide directed defendant's audit team to compare "source data with data submitted for funding purposes by the community school." On May 16, and May 18, 2000, Ross and George Phillips, another area coordinator, audited plaintiff. Witt was responsible for assisting the audit team, and he provided the team with a list that Nordyke had prepared to document "practical learning requirements" that the students had completed. Ross testified that he did not understand the significance of the information contained in the document, that Witt was unable to explain it to him, and that Nordyke was unavailable during the audit. Ross did not include any information from the document in his calculations.

{¶ 8} On August 7, 2000, Tavakolian sent Nordyke a letter informing him that based on the 1999 fiscal year audit, defendant had computed an FTE enrollment of 160.1 students and determined that plaintiff had received an overpayment in the amount of $174,831.35. Defendant deducted the calculated overpayment from plaintiff's funding for May and June 2000. Tavakolian's letter informed Nordyke that he could submit a "letter of explanation" for defendant's consideration if he did not agree with the FTE computation. The letter also stated that the settlement amount would become final if plaintiff failed to submit a letter of explanation by August 21, 2000. Although plaintiff did not respond with a letter of explanation, on November 27, 2000, plaintiff's counsel sent a letter to Tavakoli-

an that disputed both the legal basis for the audit and defendant's FTE calculation.

{¶ 9} In essence, plaintiff asserts in its complaint that defendant breached the July 31, 1998 contract and exceeded the powers conferred upon it by law when, based upon inaccurate data that were compiled during the FTE audit, it withheld funding for the 2000 fiscal year. The dispute between the parties primarily concerns certain figures that defendant included in its FTE calculation. Specifically, plaintiff contends that defendant failed to account for "practical learning hours" and that defendant improperly used 1,050 hours per year, rather than 920 hours, to compute the FTE equivalent. As a result, plaintiff claims that defendant's FTE calculation grossly understated plaintiff's enrollment.

{¶ 10} A breach of contract occurs when a party demonstrates the existence of a binding contract or agreement, the non-breaching party performs its obligations, the other party fails to fulfill its contractual obligations without legal excuse, and the non-breaching party suffers damages. *Garofalo v. Chicago Title Ins. Co.* (1995), 104 Ohio App.3d 95, 661 N.E.2d 218. In this case, the contract between the parties incorporated R.C. Chapter 3314 by reference.

{¶ 11} The contract provides plaintiff's governing authority with the power to "carry out any act and ensure the performance of any function that is in compliance with the Ohio Constitution, Ohio Revised Code Chapter 3314, and other statutes applicable to community schools and the terms of this contract * * *." Pursuant to former R.C. 3314.08(K), defendant was authorized to "adjust the amounts subtracted [from traditional public schools] and paid [to community schools] * * * to reflect any enrollment of students in community schools for less than the equivalent of a full school year." The issue before the court is whether defendant performed the audit and calculated the adjusted FTE in accordance with R.C. Chapter 3314 and the terms of the contract.

{¶ 12} Plaintiff asserts that it made available all of the data that were required according to defendant's resource guide, wherein defendant's audit team was instructed to compare "source data" with the data that had been previously submitted by plaintiff for funding purposes. The resource guide identified the previously furnished enrollment data as the AGG 7 report, referred to as an EMIS report, and the ADM–1 form (ADM report).

{¶ 13} It is undisputed that the FTE figure that was computed by Fred Ross in his audit report was inaccurate and inconsistent with the enrollment data that were available to him. In his trial testimony, Ross acknowledged that he chose not to rely on the information in the EMIS report because he had been advised by someone at OSF that plaintiff's EMIS report was not reliable. Ross reviewed the ADM report and he was aware that the report was not a complete record of student enrollment for the entire school year. Ross testified that he had been

advised by Nordyke that a supplemental attendance report would be made available to the audit team and that it included the names of students who were enrolled after September and therefore were not listed on the ADM report. Ross testified that Witt gave him an attendance record, but he discovered that the record was incomplete and documented attendance for only the months of April, May, and June. Ross did not compare the supplemental attendance record with the ADM report.

{¶ 14} Defendant correctly asserts that its efforts to perform the audit were frustrated by Nordyke's reluctance to schedule the audit and by plaintiff's failure to provide an accurate and timely compilation of enrollment records. However, the court finds that once the audit began, defendant's audit team failed to collect and review relevant information that was available. Defendant's resource guide identified the information that was needed to complete the audit and included a data form that was provided as a suggested means for plaintiff to supply the data. The resource guide stated that "[h]owever, if the required student data [are] available in other documents, use of this form is not required."

{¶ 15} At the time of the audit, Ross was shown the file cabinets that contained individual files for each student that had been enrolled. Ross did not compare individual student records to the EMIS report or to the attendance records provided by Witt. Although Ross testified that Nordyke was unavailable to explain the attendance record, Nordyke testified that he had attempted to explain the record to Ross and that it represented a summary of information that was contained in the individual student records. Nordyke further testified that he was not asked about the procedure that plaintiff had used to track and document personal learning requirements. According to Nordyke, prior to receiving the October 1999 resource guide, plaintiff had not received any guidance from defendant concerning documentation of learning requirements. The court finds that defendant's audit team did not consider all relevant student records and failed to gather sufficient data to allow it to perform an accurate calculation of plaintiff's FTE.

{¶ 16} Additionally, the incomplete data that were obtained by the audit team were insufficient to allow defendant to perform an accurate "desk review." Defendant was unable to reconcile the FTE figure that was used as the basis to withhold funds from plaintiff with the audit worksheets that were submitted by Ross. Likewise, plaintiff was unable to dispute defendant's audit results because it was not provided with the audit report or the figures upon which the FTE computation was based. Defendant's audit team did not perform an exit interview, nor was plaintiff otherwise given an opportunity to review the audit results. Although Tavakolian's August 7, 2000 letter allowed plaintiff two weeks to submit

a "letter of explanation," plaintiff had no access to defendant's audit findings to dispute the FTE calculation.

{¶ 17} The subsequent desk review that was performed by Barbara Garey, a fiscal officer for OSF, was based upon several inaccurate assumptions. Garey assumed that (1) only hours of classroom instruction and not hours of practical learning that are completed outside the classroom were to be included for the purpose of calculating FTE; (2) the contract required plaintiff to provide a minimum of 1,050 hours of learning opportunities rather than 920 hours; (3) plaintiff's school day was 4.5 hours because one-half hour for lunch must be deducted from the five-hour school day; and (4) plaintiff was in session for only 164 days during the 1999–2000 school year.

{¶ 18} With regard to practical-learning requirements, plaintiff asserts that its educational plan was negotiated with defendant's OSO and specifically provided for hours of practical learning. Plaintiff's education plan included a curriculum that was based upon levels of study and identified graduation requirements for each "Form of Study." According to the curriculum overview in the educational plan, "there are practical requirements for each Form. These practical requirements allow each student to choose from several different kinds of opportunities to gain and use practical knowledge in their area of interest. A certain amount of practical study is required on each Form."

{¶ 19} Nordyke testified that all students were required to complete a minimum number of hours of practical learning. Both Nordyke and Stephen Ramsey, formerly the assistant director of OSO, testified that learning opportunities represented activities that were guided and supervised by certified teachers that support the goals of the school. Ramsey explained that community schools were established to develop innovative teaching for children who had not performed well in traditional schools. According to Ramsey, unless the school contract stated otherwise, learning opportunities were not limited to classroom instruction during school hours. Tavakolian testified that the OSF would defer to the judgment of OSO on questions regarding whether certain types of learning activities qualified for funding purposes. Based upon the evidence and the testimony of Nordyke, Ramsey, and Tavakolian, the court finds that the contract between the parties contemplated that properly documented hours of practical learning would be included in FTE funding calculations.

{¶ 20} Tavakolian and Ramsey also testified regarding the number of hours of learning opportunities that translate to an FTE calculation that represents full funding for each student.[2] Tavakolian testified that OSF would accept a determi-

---

2. The parties agree that the denominator in the FTE equation is the total number of practical learning hours per student. Therefore, defendant's use of 1,050 rather than 920 total hours resulted in a lower FTE for funding purposes.

nation by OSO regarding the number of hours of learning opportunity upon which a community school is funded. Ramsey testified that all community schools were funded based upon 920 hours of learning opportunities. Ramsey explained that there were many discussions regarding the number of hours of learning opportunity that should be used to calculate FTE and that the OSO concluded that it would be "unfair" to use a number greater than the statutory minimum of 920 hours. Both R.C. 3314.03(A)(11)(a) and Article III of the contract between the parties provide that plaintiff shall "provide learning opportunities to a minimum of twenty-five students for a minimum of nine hundred twenty hours per school year."

{¶ 21} Furthermore, Ross's audit notes show that all of his FTE calculations were based upon 185 days of school; 185 school days with five hours of instruction each day equates to 925 total hours. Although it appears that Ross used days of attendance rather than hours of learning opportunity in his calculations, Garey chose to use 1,050 hours for her computations based upon the contract language stating that plaintiff "will be providing *or supervising* activities for a minimum of 1,050 hours per year." (Emphasis added.) Plaintiff's education plan shows that the reference to 1,050 hours of practical learning was based upon the school calendar that showed a five-hour school day and scheduled "practical requirements" that began two weeks prior to the beginning of formal classes. The court finds that trial testimony, R.C. 3314.03(A)(11)(a), and the contract language established that the FTE calculations should have been based upon a minimum of 920 hours of learning opportunity per school year and that defendant's "desk review" improperly relied on 1,050 hours of learning opportunity to compute FTE.

{¶ 22} Although Tavakolian, Garey, and Ross testified that it was defendant's policy to give plaintiff "the benefit of the doubt" in performing the audit and calculating FTE, the court finds that defendant's auditors used unduly restrictive interpretations of the components that determined plaintiff's student enrollment. Ross testified that at the time of the audit, he had no understanding that plaintiff documented practical learning. Indeed, the assumptions regarding hours of learning opportunity that Garey used during her subsequent desk review were even less favorable to plaintiff than those used by Ross, and her assumptions resulted in a lower FTE than was originally calculated.[3]

{¶ 23} In response to defendant's audit report, plaintiff directed Witt to compile a list of students that included the dates of entry and withdrawal for the 1998–1999 school year. Witt then computed a total number of learning opportu-

---

3. The court was unable to determine whether the other assumptions used by Garey differed from those used by Ross because Ross could not reconstruct his calculations.

nity hours based upon Nordyke's practical learning summary. At trial, Witt acknowledged inconsistencies in the number of practical learning hours between his compilation and the Nordyke list; however, he maintained that there were no material errors in his report. Witt calculated that plaintiff's FTE was 204.81 based upon a five-hour school day, a 165–day academic year, and 920 hours of learning opportunity.

{¶ 24} While the court finds that the figures contained in Witt's FTE computations are more accurate than the data relied upon by either Ross or the subsequent "desk review," in light of the noted inconsistencies in Witt's calculations, the court cannot accept plaintiff's proposed FTE figures. Nor can the court attempt to reconstruct the FTE audit report that should have included a review of original source documents.

{¶ 25} Plaintiff's EMIS and ADM reports for 1998–1999 showed that an additional 42 students enrolled after September 16, 1998, and 36 students withdrew during the school year. Harmony received funding based upon the October 1998 ADM "snapshot" enrollment of 201 students. According to the testimony of Witt and Ross, and the 1998–1999 EMIS and ADM reports, plaintiff's student population remained essentially stable at or near the ADM enrollment number of 201 students.

{¶ 26} Having determined that defendant's decision to withhold funding from plaintiff was based upon an inaccurate audit report and FTE calculation, the court finds that defendant failed to fulfill its contractual and statutory obligations as plaintiff's sponsor. Furthermore, the court finds that the October ADM enrollment figure of 201 that was used to calculate plaintiff's funding for the second half of the 1998–1999 school year is the most reliable measure of plaintiff's student enrollment. The court notes that the October enrollment was also used by Ross as a basis for calculating plaintiff's revised FTE.

{¶ 27} Upon review of the testimony and evidence, the court finds that defendant wrongfully withheld funding from plaintiff as a result of its reliance on the flawed audit report. Accordingly, judgment shall be rendered in favor of plaintiff in the amount of $174,856.35, which represents the funds that were wrongfully withheld from plaintiff plus the $25 filing fee.

{¶ 28} This case was tried to the court on the issues of liability and damages. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is hereby rendered in favor of plaintiff in the amount of $174,856.35, which includes the filing fee paid by plaintiff. Court costs are assessed against defendant. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

Judgment for plaintiff.

J. WARREN BETTIS, J., retired, of the Columbiana County Court of Common Pleas, sitting by assignment.